EASTON and another *v.* HODGES and another.

*(Circuit Court, E. D. Wisconsin. December 1, 1883.)*

1. PLEDGE—SPECIAL PROPERTY—POWER—WAREHOUSE RECEIPT.
    A person to whom specified grain in an elevator is, by a warehouse receipt, pledged for the repayment of a loan of money, has such a special property in the grain as will support an action of trover for the converson thereof.
2. FRAUD—RESCISSION.
    A pledgee, who by fraudulent misrepresentations has been induced to release his interest in the property under pledge, is entitled, upon discovering the fraud, to reassert his claim to the property against any one privy to the fraud.
3. CONFUSION OF GOODS—GRAIN IN ELEVATOR.
    The owner of specified grain in an elevator, which the proprietor mingles with grain of better quality, retains his property in the same number of bushels of the improved article as he originally owned of the inferior grade.
4. ELECTION—REQUISITE INFORMATION.
    A pledgee who has been induced by fraud to release the property pledged and to receive bills of exchange instead, will not be held to have elected to affirm the transaction, and to have waived his right to reclaim the goods, because, before obtaining information that would enable him to trace the goods, he has brought suit upon the bills.
5. PLEDGE—SEVERANCE BETWEEN DEBT AND SECURITY.
    There may be circumstances under which a pledge can be assigned without the debt secured by it. Such a case may arise when the assignee takes only a nominal interest for the purposes of an action at law.

At Law.

*H. M. Finch* and *G. W. Hazelton*, for plaintiffs.   *James G. Jenkins* and *Joshua Stark*, for defendants.

BUNN, J., (*charging jury*.)   This action is brought by the plaintiffs, James H. Easton and Alfred E. Bigelow, who are citizens of the state of Iowa, against the defendants, Lyman F. Hodges and James H. Smith, citizens of the state of Wisconsin, to recover in trover the value of 11,500 bushels of No. 1 wheat claimed by said plaintiffs to belong to them, and to have been wrongfully and tortiously shipped by William H. Valleau, from his elevator at Decorah, in the state of Iowa, to the defendants, at Milwaukee, Wisconsin, in April or May, 1876, and tortiously and wrongfully received by said defendants, at Milwaukee, and converted to their own use.   The issue upon this, the plaintiffs' charge, is formed by a general denial on the part of defendants, and constitutes the principal question in the case for determination by the jury.   The plaintiffs are bankers and money loaners, residing at Decorah, in the state of Iowa.   The defendants are commission men, doing business at Milwaukee under the firm name of L. F. Hodges & Co.   W. H. Valleau, also residing at Decorah, Iowa, was, in 1876, the owner of a grain warehouse and elevator at Decorah, and engaged in the business of buying, storing, and shipping wheat and other grain and produce in and from the said elevator.   He also carried on a like business at other points in Iowa. One J. H. Baker, also residing at Decorah, was engaged in buying and storing wheat at the same elevator, but not as a partner with Valleau, nor having any interest in the elevator.

The evidence tends to show that in January and February, 1876, the said Valleau and said Baker, each having wheat stored in Valleau's elevator, and wishing to borrow money, each on his own account, for the purpose of carrying on the business of buying, storing, and shipping wheat in, through, and by means of said elevator, applied to the plaintiffs, Easton & Bigelow, and to the First National Bank of Decorah, Iowa, of which Easton was the president, for loans of money, and that after some negotiations on January 31st, it was agreed that the bank should advance to said Baker the sum of $3,000 upon his note, said Baker to turn over to the bank 4,000 bushels of his (Baker's) wheat, then in said elevator, as a pledge to secure the repayment thereof, and that warehouse receipts should be executed and delivered by Valleau, the warehouseman, directly to the bank, as evidence of such pledge or security of the wheat, which was to be in special bins in the warehouse or elevator; the numbers and designations of the bins to be marked upon the warehouse receipts. The evidence further tends to show that, pursuant to this arrangement and understanding, and pursuant to further arrangements of like character, the bank did loan and advance to Baker, on January 31, 1876, $3,000, cash; on February 16, 1876, $1,300; and on February 19th the further sum of $1,000,—making in all $5,300,—and took Baker's notes and a pledge of Baker's wheat in bins, designated

and selected by the parties then or shortly afterwards, and marked upon the wheat receipts, as security for the payment of the notes, and evidenced by the execution and delivery of warehouse receipts for the said wheat by Valleau directly to the bank, with the numbers of the bins in which the wheat so turned out was contained in the warehouse marked upon the said receipts as follows: To secure the loan of said $3,000, 4,000 bushels of No. 1 wheat; to secure the loan of $1,300, 2,000 bushels of No. 1 wheat; and to secure the loan of $1,000, 1,500 bushels of No. 1 wheat,—making, to secure the entire sum of $5,300, 7,500 bushels of No. 1 wheat. That on February 11, 1876, the plaintiffs, Easton & Bigelow, advanced to Valleau himself the sum of $3,000 cash, and took his notes therefor, and a pledge of his own wheat then in the said elevator, selected, designated, and set apart in special bins, to the amount of 4,000 bushels of No. 1 wheat, and that, as evidence of such pledge or turning out of the wheat, Valleau executed and delivered to Easton & Bigelow his warehouse receipts for the 4,000 bushels of wheat in the said warehouse and in the bins so agreed upon and selected by the parties.

These receipts have been introduced in evidence, and I think the effect of their execution and delivery, if made with the intent and purpose above stated, as the evidence is directed to show, was to constitute a pledge in the nature of a mortgage, or turning over to the bank and to Easton & Bigelow, respectively, as the holders thereof, of the wheat contained in the bins so selected, to the amount of the number of bushels specified in the said receipts, respectively. And though the said receipts and transaction of turning over the said wheat, of which the said receipts form a part, would not transfer to the holders an absolute title to the wheat as general owners, it would give to them, respectively, the constructive possession of the wheat so pledged, and a special interest in the same to the extent and value of the money so advanced, with the interest thereon, which would enable them to maintain trover against any and all persons who should wrongfully take and convert the same to the takers' own use, against and in violation of the said special interest of the holders, without their consent and against their will. It has become the usual and customary course of doing this kind of business for persons delivering grain into elevators to take warehouse receipts for the same, and also for the purchasers of wheat, who are the owners of warehouses or grain elevators, to pledge their own grain in store and already paid for to bankers and brokers, to secure advances of money to enable them to carry on the business of buying and moving grain to the seaboard, and to deliver warehouse receipts for the grain so in store, and these grain receipts are considered as giving the constructive possession of the grain, and as conveying either an absolute title or a special interest, according to the nature of the transaction, and as partaking in many respects of the character of commercial paper, which may be transferred by indorsement, either absolutely or as collateral security,

and the holder entitled to claim the grain according to the rights of the original parties to the transaction; and this practice and method of doing business has obtained for a long time, and become an important part of the commercial system of the country, so that it is well understood, and according to the usual course of business, that the use and purpose of a warehouse or grain elevator is not more to store the grain of the owner thereof than that of any and all other persons. Up to this point there is, perhaps, no great dispute about the facts. Whether there is or not, the jury must find the facts upon this part of the transaction, as upon every other, from the weight of evidence in the case. What the court most desires is that you should have a clear comprehension of the issues actually before you for determination, and the law applicable to the facts as you may find them. The court can only state to you what these issues are and what the evidence is directed to prove. What it does in fact show is for your consideration and finding exclusively.

The claim which the plaintiffs make against the defendants is, that Valleau, in April and the first part of May, 1876, some three months after these loans and advances of money were made, wrongfully, and in violation of the rights of the holders of these warehouse receipts, shipped the wheat pledged to the holders of such receipts, the First National Bank and Easton & Bigelow, to the defendants in Milwaukee, and that the said defendants, having had previous notice and information of the receipt holders' interest in the wheat, and in violation of their rights, received the wheat from Valleau and converted the same to their own use. And this, I take it, is the important and main issue in the case for your consideration and determination: Did the defendants so receive and wrongfully convert to their own use any portion, and if so *how much*, of the wheat of the plaintiffs stored in the bins in Valleau's warehouse, designated and set apart for the holders of the warehouse receipts? The burden of proof upon this question is with the plaintiffs, whose duty will be to satisfy you, by a preponderance in the weight of evidence, that their allegations herein are true; and in the determination thereof it will be your privilege and duty to patiently consider and weigh all the facts and circumstances in the case bearing upon the point. You will exercise your best discretion and judgment upon the testimony, and say how you are convinced. If the plaintiffs fail to satisfy you upon this issue, however you might find upon any other question in the case, your verdict should be for the defendants. If the defendants have not received and converted to their own use any portion of the wheat of the plaintiffs, or in which the plaintiffs held a special interest by virtue of said receipts, then your finding should be in favor of the defendants. If you find this issue in favor of the plaintiffs, your verdict should be for them, and you will in that case determine from the evidence the amount of wheat so received and wrongfully converted by defendants, and assess the plaintiffs' dam-

ages therefor at the agreed rate of .904 per bushel, (not exceeding the amount of the plaintiffs' debt against Valleau and Baker) with interest at 7 per cent. from the time of the demand made upon the defendants for the wheat.

There is no dispute, I think, about the fact that, during the month of April and first days of May, Valleau caused to be shipped to market from the elevator at Decorah all, or nearly all, of the wheat stored therein, including the wheat held by the First National Bank and Easton & Bigelow under the warehouse receipts held by them. The plaintiffs claim, and their evidence is directed to show, that on the sixth of May, 1876, Valleau came to the office of the First National Bank and represented to the officers of the bank who had the notes and wheat receipts in custody, that he wanted to ship the wheat in the elevator, and that he could draw upon Hodges & Co., in Milwaukee, to the amount of $10,000, and that upon such representations, and upon the execution and delivery to the bank of two drafts for the sum of $5,000 each upon Hodges & Co. in favor of the bank, which was received and discounted by the bank and passed to Valleau's credit, the officers thereof delivered up to Valleau the notes taken upon the said loans, together with all of the said warehouse receipts and other papers; and that such representations, so far as his being able to draw upon Hodges & Co. for money is concerned, were falsely and fraudulently made by Valleau for the purpose of obtaining possession of such notes and receipts, knowing at the time or having reason to believe that said drafts would not be paid; that the drafts were immediately forwarded by the bank to Milwaukee and presented to Hodges & Co. for payment, payment refused, and the drafts thereupon protested for non-payment and returned to the bank at Decorah; that on the receipt of notice of the non-payment of the said drafts by Hodges & Co., the officers of the bank went to the elevator of Valleau and ascertained that Valleau had shipped the wheat, and, as the plaintiffs claim, without their knowledge or consent. And upon this part of the case is another disputed question of fact presented for the consideration of the jury, but really included in the main issue, and that is, whether the plaintiffs consented to the shipment by Valleau of their wheat.

The evidence of plaintiff and defendant upon this point seems to be conflicting. Whether it be so or not is a question for the jury; and if you find it conflicting, it will be your duty to reconcile such conflict if you are able, and in any event to find the fact according to the weight of evidence, as you are fairly convinced. If you find the fact to be that the bank, acting for itself and Easton & Bigelow, or the plaintiff Easton, acting for Easton & Bigelow and the bank of which he was the president, consented to the shipment of the wheat, and that Valleau shipped it pursuant thereto, the plaintiffs could not recover the wheat from the defendants, provided it came into their hands in the usual course of business, without any notice or knowl-

edge of any fraud practiced by Valleau, by means whereof such consent may have been obtained. But if you should find that Valleau had already shipped the wheat, unbeknown to plaintiffs, before such consent was asked for, or that he obtained such consent by fraud, in falsely and fraudulently representing that he might draw upon Hodges & Co., and that the drafts would be paid, when he knew they would not be paid or had no reason to believe that they would be paid, and also that Hodges & Co. *were privy to such fraud*, then such consent would not confer any authority or right, either upon Valleau to ship the wheat, or Hodges & Co. to receive it; that is to say, such wheat as you may find belonged to the bank or to Easton & Bigelow by virtue of the receipts. If such consent to the delivery of the notes and receipts, and the shipment of the wheat, was so obtained by fraud, and the defendants connived at the fraud or were parties to it, then such delivery and consent would not be binding upon the bank nor upon Easton & Bigelow, and upon discovery of a knowledge of the fraud they might rescind the transaction and reassert their claim upon the wheat in the hands of the defendants, so far as you may find such wheat went into their hands.

The evidence tends to show (perhaps it would be more accurate to say the evidence does show) that after the bins of wheat pledged to plaintiffs and their assignors were selected and set apart for them, Valleau, without the knowledge and consent of the plaintiffs or the bank, and for the purpose of improving the grade of the wheat in those bins, mixed other wheat of his own of a better quality with the wheat in those bins, in such a manner as to render it impracticable to distinguish or separate the wheat so subsequently put into the bins, and so mixed, from the wheat in the bins at the time they were so selected and set apart. I cannot think that such a mingling of plaintiffs' wheat with that of Valleau subsequently purchased from the farmers, or taken from other wheat in the elevator, without the plaintiffs' knowledge, would affect the plaintiffs' title to the wheat in those bins, but that their interest would attach to an equal number of bushels of the wheat in those bins upon and from the time of such mixing.

There was a legal question of some difficulty raised on the trial by defendants' counsel, whether the act of the bank in prosecuting the attachment suit in Iowa against Valleau upon the two drafts for $5,000 each did not constitute of itself an election to affirm the transaction of the sixth of May, whereby the notes and receipts were delivered up and the $10,000 in drafts taken in their stead at the bank, and a waiver of any right of action against the defendants for a conversion of the wheat. Upon careful consideration I feel myself unable to so advise you, or to concur in this view. I cannot say to you as a matter of law that the fact of the commencement and prosecution of the suit against Valleau upon the drafts would of itself constitute such an election, or bar the plaintiffs of their remedy

in following their interest in the wheat wherever they could find it. The wheat was their security for the debt which has never been paid. They had no contract with the defendants. Their contract obligations were with Valleau and Baker. They had a right to follow their wheat, if they could find it. They also had the right to claim their several debts from Valleau and Baker. Whenever the debts should be satisfied they could claim nothing further from either source, and the evidence tends to show that at the time of the commencement of the action against Valleau in June, 1876, and for a long time afterwards, and until after their claim against defendants was asserted by the commencement of this action in October, neither the plaintiffs nor the bank had obtained the information which would enable them to trace the wheat to its proper destination after the shipment by Valleau. And it seems tolerably clear that until they had received notice or information of the facts bearing upon the question of the receipt of the wheat by the defendants, and their right to recover from them, and which the evidence tends to show they afterwards obtained, they could not be considered as making an election which would bar their right to assert their claim to the wheat.

The First National Bank of Decorah, which held the pledge of 7,500 bushels of No. 1 wheat, to secure the $5,300 loan of the bank to J. H. Baker, on October 12, 1876, executed the written assignment which has been introduced in evidence, purporting to assign and set over to Easton & Bigelow, who already held the receipts for the 4,000 bushels of No. 1 wheat pledged to them for the security of the loan of $3,000 by them to Valleau, all the bank's interest in the said 7,500 bushels of wheat pledged to the bank by Baker, together with the cause or causes of action growing out of the shipment and conversion of the same. The assignment is absolute on its face, and authorizes Easton & Bigelow, either in their own names or in the name of the bank, to prosecute the proper action or actions for the recovery of the wheat or its value.

It has been objected by the defendant, and there seemed to be much force in the objection, that the bank could not assign their interest in the wheat, and the cause or causes of action arising out of the conversion thereof, without also transferring the debt against Baker, which the wheat was pledged to secure. After the best thought I have been able to give the question, I think, though the general principle which the defendants invoke is well settled, in the circumstances of this case it does not properly apply here. There is here no substantial severance of the security afforded by the pledge of the wheat, and the debt against Valleau. Easton and Bigelow had close relations with one another, and with the bank. They were partners in the banking business at another place. Easton was himself the president of the First National Bank. They already held a similar claim arising out of the pledge of the 7,500 bushels to secure the Baker loan of $5,300. It was a matter of convenience that both claims, being so

nearly allied in their circumstances, should be prosecuted in one action instead of two. Burdick, the cashier of the bank, in testifying to his interest in the event of this suit by reason of his being a stockholder in the bank, testifies in substance—and I think there is no attempt to refute his evidence on this point—that it was the understanding between the bank and Easton & Bigelow, at the time of the assignment, that whatever sum should be collected by the plaintiffs upon that claim should be paid over to the bank. If this were so, Easton & Bigelow, in the prosecution of this claim, stand in the place of and represent the bank, with but a nominal interest, so far as that claim is concerned, the substantial interest being still in the bank, which held the debt against Baker, and which, by the understanding between the parties to the assignment, would be entitled to the proceeds upon a realization of the claim. In this view, the severance of the security from the debt would be of a nominal rather than substantial character.

In the circumstances of this case, therefore, I am disposed to think it was proper for the bank to transfer the right of action just as was done, that the two claims might be prosecuted in one suit, and that the defendant cannot complain that such a course was taken, and that they have one instead of two suits to defend, growing out of transactions so closely related. So far as the question of some portion of the wheat that was stored in the bins of wheat selected and set apart for the security of the loans, being afterwards taken out by Valleau and sold to witness Standring, it is agreed by counsel in open court, before the jury, that that question shall go to the jury as a question of fact, and that if you find that any portion of such wheat so selected and set apart was sold to Standring, that whatever the amount was the plaintiffs cannot recover for it from the defendants, or for any wheat that was put in its place by Valleau. So that I have no need to instruct you as to what the law would be in that case, if no such agreement had been made by counsel.

There are several questions of law arising in the case and discussed by counsel, but the issues of fact which are for you are few and very simple, and I have thought it best to submit the case to you upon these issues as I have endeavored to state them to you, and to request you to return a general verdict either for plaintiff or defendant, according as you shall find these issues from the evidence. If the court has erred in regard to the law, I can only hope that such error or errors may be corrected upon a more thorough and exhaustive consideration of the questions involved, either here or elsewhere, and complete legal justice done to both parties. The testimony has necessarily taken a rather wide range, and perhaps, under the rulings of the court, much of the correspondence and intercourse between the parties, and between defendants and Valleau, may not have much bearing upon the issues. But it was practically impossible to separate and distinguish on the trial such correspondence, and it has all

gone to the jury, but with the trust and confident expectation on the part of the court that there is nothing in its nature that can mislead or prejudice the minds of the jury. Although you should find that portions of it have little bearing on the issues in this case, such correspondence, and the evidence of the transactions between the parties and with Valleau and Robinson subsequent to the shipment of the wheat, was admitted for the consideration of the jury only so far as it should tend to throw light upon the principal issue in the case, whether the wheat of the plaintiffs and of the bank in the elevator of Valleau was shipped by him, without plaintiffs' or the bank's consent or knowledge, and came into the defendants' hands and was converted by them to their use, and if so, how much.

The court cautioned the jury on the trial, and I repeat it now, that you are to consider all the facts and circumstances received and appearing in evidence fairly and impartially, so far, and so far only, as they have any bearing upon the issues of the case, and not to allow yourselves to draw any unwarrantable inference therefrom. The burden of your duty will be to decide these issues of fact according to the justice of the case, as appears to your minds from the testimony and the law applicable to the case as given you by the court, giving just so much weight, and no more, to each and every fact and circumstance as in your best judgment they seem entitled. Evidence is that which demonstrates and makes clear to the mind of the jury the very truth of the matters in issue, and the jury are the exclusive judges of the amount of credit they ought, in justice, to give to the testimony of any witness, and to any fact or circumstance developed on the trial. After full, patient, and impartial consideration of all the testimony, you are to say how you are reasonably convinced, and to return a verdict which shall represent your best convictions from the evidence and the legal justice of the case.

I have noticed, with much satisfaction, the patient and considerate attention which you have given to the case throughout the course of a long and arduous trial. It is indeed a laborious case, and has been tried with unusual ability and exhaustiveness. When you have finished your duty the case will have been twice tried in this court, each trial occupying from two and one-half to three weeks. This consideration alone renders it exceedingly desirable for the good of all concerned, if it be possible, consistent with your own convictions and sense of duty, that you should agree upon a verdict. The further responsibility attaching to the case lies with you.

Jury disagreed.